UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PERSONNEL STAFFING GROUP, LLC,<br><div align="right">Plaintiff,</div><br>-v-<br><br>XL INSURANCE AMERICA, INC.,<br><div align="right">Defendant.</div> | 22-CV-10259 (JPO) |
| XL INSURANCE AMERICA, INC.<br><div align="right">Plaintiff,</div><br>-v-<br><br>PERSONNEL STAFFING GROUP, LLC.,<br><div align="right">Defendant.</div> | 24-CV-4550 (JPO)<br><br><u>OPINION AND ORDER</u> |

J. PAUL OETKEN, District Judge:

These two cases concern the arbitration of a dispute between Personnel Staffing Group, LLC ("PSG"), a staffing agency, and XL Insurance America, Inc, ("XL"), an insurer.  Before the Court is XL's petition to confirm two arbitration awards against PSG:  one Final Award on liability and damages (the "Final Award") (ECF No. 104 ("Final Award Pet.")), and another Final Award of attorney's fees, costs, and interest (the "Fee Award") (ECF No. 123 ("Opp. Vac. Fee Award") at 13).[1]  Also before the Court are PSG's cross-motion to vacate the Final Award (ECF No. 109), and motion to vacate the Fee Award (ECF No. 121 ("Mot. Vac. Fee Award")).  Finally, before the Court is XL's request for a preliminary injunction barring PSG from pursuing a

---

[1] Unless otherwise noted, record citations are to the Electronic Case Filing ("ECF") docket in case number 22-CV-10259, and page numbers refer to those automatically generated by ECF.

declaration from the California Insurance Commissioner that contracts formed between XL and PSG are void and unenforceable as they relate to liabilities incurred in California. (Case No. 24-CV-4550, ECF No. 1 ("Compl.".) For the reasons that follow, XL's petitions to confirm are granted, PSG's motions to vacate are denied, and XL's motion for a preliminary injunction is denied as moot.

## I.    Background[2]

### A.    XL's and PSG's Execution of Worker's Compensation Agreements

This litigation began as a dispute over reimbursement for the payment of worker's compensation claims and related collateral and claim administration fees. PSG and XL contracted for XL to provide annual large-deductible worker's compensation policies to cover its national workforce for the period between June 30, 2018, to June 30, 2020. (Case No. 24-CV-4550, ECF No. 12 ("PI Mem.") at 7.) As part of that agreement, PSG was responsible for "payment of premiums, funding for paid losses and allocated loss adjustment expenses subject to a [$500,000] per claim deductible on claims submitted for coverage, posting of security for its financial commitments, and retaining and funding a third-party claims administrator." (*Id.*) Those obligations are governed by an Insurance Program Agreement and Notices of Election (IPA), a Collateral Trust Agreement, and a Third Party Claims Administrator Agreement. (*Id.*) Per the agreements, "PSG was required to post collateral to secure its future obligations to [XL] and provide a depleting loss fund account for losses within the deductible for such losses and expenses associated with PSG's claims." (*Id.* at 7-8 (emphasis omitted); ECF No. 82-2 ("IPA") at 5.)

---

[2] Except for the characterization of the relief PSG currently seeks and may obtain before the California DOI, *infra* § I.E, none of the parties' papers manifests any genuine dispute about the procedural history of this case.

The IPA provides for arbitration between PSG and XL in the event of disputes between them.  First, it contains an arbitration clause that provides:

> In the event of any dispute, except a dispute regarding the terms and conditions of the Policies, between the Company and the Insured with reference to the interpretation, application, formation, enforcement or validity of this Agreement or any other agreement between them, or their rights with respect to any transaction involved, whether such dispute arises before or after termination of this Agreement, such dispute, upon written request of either party, shall be submitted to the decision of a board of arbitration . . . .

(IPA at 12.)  The IPA also contains a delegation clause that provides:

> The parties agree that arbitration pursuant to the terms of this Article is the sole remedy for the resolution of disputes between them under this Agreement or any other agreement between them.  The board of arbitration will have complete and exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability . . . .

(*Id.*)  Finally, the IPA contains a survival clause that specifies that the article relating to arbitration "shall survive the termination of this Agreement."  (*Id.* at 14.)

## B.    Dispute Over PSG's Contract Obligations

A dispute arose in 2021 over PSG's obligations to pay and post collateral under the IPA, and XL initiated arbitration in New York.  (ECF No. 89 ("2023 Op.") at 2.)  Specifically, XL contended that PSG "defaulted on all of its obligations" under the relevant agreements.  (Final Award Pet. ¶ 14.)  PSG contended that the agreements were "void and unenforceable" as they related to insurance liability incurred in California (PSG's "California-based liability") because "they had not previously been filed with, or approved by, the California Insurance Commissioner."  (ECF No. 111 ("Cross Mot. Mem.") at 7.)  Based on that theory, PSG filed a Statement of Appeal before the California Department of Insurance (the "2021 DOI Appeal") "seeking a declaration that XL's arbitration agreements and delegation clauses were void and unenforceable, and could not support the arbitration of any dispute arising from California-based workers' compensation exposure."  (*Id.*; Case No. 24-CV-4550, Compl.) ¶ 4.)  On October 15,

2021, XL filed an Amended Demand for Arbitration that removed its claim for collateral. (Compl. ¶ 6.)[3]

On December 9, 2021, XL and PSG entered into a private stipulation in which (1) the parties declared "[a]ll the terms" of the IPA "void and unenforceable as a matter of law as they relate to [PSG's] California workers' compensation exposure"; (2) PSG agreed to withdraw the 2021 DOI Appeal with prejudice; and (3) XL promised to not seek in the New York arbitration any "amounts which may be owed under the terms of the Insurance Program Agreement and Notices of Election related to [PSG's] California workers' compensation exposure." (ECF No. 74-2 ("2021 Stipulation") ¶¶ 1-3.) Moreover, the 2021 Stipulation provided that it "expressly does <u>not</u> apply to or otherwise affect the validity and/or enforceability of the Insurance Program Agreement and/or Notices of Election for workers' compensation exposure outside the State of California." (*Id.* ¶ 4 (emphasis in original).)[4] Consistent with the 2021 Stipulation, PSG filed its notice of withdrawal of the 2021 DOI Appeal with prejudice, and the Department of Insurance closed the case. (Compl. ¶¶ 8-9; Case No. 24-CV-4550, ECF No. 22-2 ("Letter from CA DOI").)

---

[3] The Amended Demand for Arbitration included requests for: "(a) compensatory and punitive damages resulting from PSG's fraud; (b) amounts owed by PSG to [XL] pursuant to the terms of the Policies and the Agreement; (c) future payments and reserves established by [XL]; (d) attorney's fees and litigation costs incurred by [XL]; (e) amounts due and owing for third-party claim administration services; (f) an award of pre- and post- judgment interest; and (g) such other and further relief as the Panel deems just and proper, including but not limited to, converting the Policies to guaranteed cost policies, ordering PSG to comply with an audit of payroll, and/or ordering PSG to remit payment of the audited premiums for the Policies less payments to date." (Compl. ¶ 6.)

[4] While the parties were finalizing the stipulation, XL conceded the issue on appeal before the California DOI, effectively precluding a ruling on the merits of the IPA's enforceability as to PSG's California-based liability. (*See* ECF No. 114 at 4.)

C.       New York Arbitration

The New York arbitration proceeded to an interim final award regarding reimbursement of fees that XL paid to PSG's claim administrator, Gallagher Bassett Services, Inc. ("Gallagher Bassett"). (ECF No. 72 ("Case Summary") at 1.) Upon the issuance of that award, PSG sought preliminary injunctive relief in California state court enjoining XL from proceeding with the New York arbitration on the theory that XL was violating both California law and the terms of the 2021 Stipulation by continuing to seek amounts comprising PSG's California-based liability. (2023 Op. at 2-3.) XL successfully removed the case to the United States District Court for the Central District of California, which transferred the case to this Court and denied the motion for a preliminary injunction without prejudice. (*Id.* at 3; Case Summary at 2.) Following another round of briefing after the venue transfer, this Court denied PSG's motion for a preliminary injunction, concluding that the 2021 Stipulation did not void the IPA's arbitration and delegation clauses under the approach set out by the U.S. Supreme Court in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006). (2023 Op. at 4-6.)

On August 2, 2023, a majority of the arbitration panel issued a final award of $37,998,473 in "past and future deductible obligations"; $1,796,364 in "Claim Service Fee obligations"; and attorney's fees, costs, and interest at an annual rate of 6%. (ECF No. 104-1 ("Final Award") at 11-12.) Panel member Mark Gordon dissented from the Final Award, arguing that "the written concessions issued on behalf of XL by its counsel [before the California DOI] establish the intent to forego any arbitrable rights it had with respect to California exposure." (*Id.* at 3.) The dissenting arbitrator argued further that, regardless of the arbitrability of PSG's California-based liability, XL's damages should have been "limited to reimbursement payments made by XL within PSG's retention along with Gallagher Bassett fees." (*Id.* at 4.) In other words, he would have excluded the panel's award of accelerated damages—which he

determined were authorized explicitly only by the IPA and thus void with respect to any California-based liability—and otherwise inequitable.  (*Id.*)[5]  In response, the majority of the arbitration panel determined that the 2021 Stipulation's exclusion of amounts "which may be owed" under the IPA applied only to collateral, which XL did not seek in the arbitration and which the panel did not award.  (*Id.* at 6 n.1.)  Moreover, the majority determined that XL's right to acceleration, "while [it] . . . may be provided for in the IPA, . . . is not confined to the IPA, but is rather a customary remedy under insurance policies akin to the ones at bar in the event of default, regardless of the provisions or existence of the IPA."  (*Id.*)  On October 17, 2023, the panel issued an award of fees, costs, and interest as provided for in the Final Award.  (ECF No. 113-1 ("Fee Award") at 3.)  Arbitrator Gordon again dissented, renewing his objection to arbitrability of damages awarded in the Final Award and arguing that XL should not be entitled to fees incurred in the unsuccessful pursuit of fraud claims and which were requested in an improper format.  (ECF No. 113-2 ("Gordon Dissent to Fee Award") at 2.)

### D.    District Court Proceedings Following the Final Awards

Two rounds of briefing in this Court regarding the awards followed.  The first round concerned the Final Award:  On August 3, 2023, XL filed a petition to confirm the Final Award.  (Final Award Pet.)  PSG filed a combined opposition to the petition and cross-motion to vacate the Final Award.  (Cross Mot. Mem.)  XL filed a combined opposition to the cross-motion and memorandum in further support of its petition.  (ECF No. 112 ("Opp. to Cross Mot.").)  PSG filed a reply in further support of its motion to vacate.  (ECF No. 114 ("Cross Mot. Reply").)  The second round concerned the Fee Award:  On January 12, 2024, PSG moved to vacate the

---

[5] Gordon would have also limited interest to actual damages accrued, rather than to future obligations.  (Final Award at 5.)

Fee Award.  (Mot. Vac. Fee Award.)  XL opposed the motion and simultaneously petitioned for

confirmation of the award (Opp. Vac. Fee Award), and PSG filed a reply in further support (ECF

No. 128 ("Vac. Fee Award Reply")).

###### E.    PSG's Second California DOI Appeal

During the pendency of XL's petitions to confirm and PSG's motions to vacate the

awards, PSG sought to reinstate its 2021 DOI Appeal.  (Compl. ¶ 11.)  The California DOI

denied the request for reinstatement, prompting PSG to submit a new Complaint and Request for

Action with the California DOI (the "2024 DOI Action").  (*Id.* ¶ 13.)  XL characterizes the new

DOI action as seeking an order that XL "immediately cease and desist from enforcing a

purportedly 'illegal' side agreement under California law on the basis that the side agreement

was 'void and unenforceable as a matter of law with respect to risks insured in California,'"

where the "alleged enforcement complained of by PSG is [XL's] petition to confirm the

arbitration award in New York."  (*Id.*)  At a conference, counsel for PSG insisted that the relief it

currently seeks from the DOI is "akin to a declaratory judgment" that the IPA is "void and

unenforceable respecting any workers' compensation risk in California."  (Case No. 24-CV-

4550, ECF No. 19 ("Conf. Tr.") at 9:11-9:12, 9:23-9:24.)

###### F.    Preliminary Injunction Motion

On June 13, 2024, XL filed a new complaint—in Case Number 24-CV-4550—alleging

PSG's breach of the 2021 stipulation by pursuing the 2024 DOI Action.  (Case No. 24-CV-4550,

Compl. ¶¶ 65-83.)  On June 28, 2024, XL filed a motion for a preliminary injunction, seeking to

enjoin PSG from further pursuing the 2024 DOI Action, arguing that XL would suffer

irreparable harm if the California DOI were to issue a ruling with *res judicata* effect that

precluded consideration of the petitions to confirm and to vacate the awards.  (Case No. 24-CV-

4550, ECF No. 12 ("PI Mot.") at 20-23.)  PSG opposed the motion (Case No. 24-CV-4550, ECF

No. 21 ("PI Opp.")), and XL filed a reply in further support (Case No. 24-CV-4550, ECF No. 26 ("PI Reply")).  The Court held a conference on the pending motion for a preliminary injunction, during which the parties agreed to submit additional briefing on the applicability of the recent U.S. Supreme Court decision, *Coinbase Inc. v. Suski*, 602 U.S. 143 (2024).  (Conf. Tr. 21:7–23:16.)  PSG filed its letter brief on September 20, 2024 (ECF No. 141 ("PSG *Coinbase* Letter")), and XL filed its letter brief on October 4, 2024 (ECF No. 143 ("XL *Coinbase* Letter")).  On October 2, 2024, PSG also filed a letter informing the Court that the 2024 DOI Action is scheduled for a hearing in November 2024 and that it expects a formal decision to be issued in early 2025.  (ECF No. 142 at 2.)

## II.     Legal Standard

"The role of a district court in reviewing an arbitration award is narrowly limited and arbitration panel determinations are generally accorded great deference under the Federal Arbitration Act."  *Kellner v. Amazon*, No. 22-CV-734, 2023 WL 2230288, at *1 (2d Cir. Feb. 27, 2023) (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 103 (2d Cir. 2013)).  "This deference promotes the 'twin goals of arbitration, namely settling disputes efficiently and avoiding long and expensive litigation.'"  *Kolel Beth*, 729 F.3d at 103 (quoting *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 405 (2d Cir. 2009)).  Section 10 of the Federal Arbitration Act ("FAA") permits district courts to vacate an arbitration award in four circumstances:

(1)  where the award was procured by corruption, fraud, or undue means;
(2)  where there was evident partiality or corruption in the arbitrators, or either of them;
(3)  where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). District courts may not exceed the grounds provided for in the FAA for vacating an arbitration award. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008). And within the FAA's grounds, "the burden of proof necessary to avoid confirmation of an arbitration award is very high, and a district court will enforce the award as long as 'there is a barely colorable justification for the outcome reached.'" *Kolel Beth*, 729 F.3d at 103-04 (quoting *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008)).

## III.  Discussion

### A.  Arbitrability of PSG's California-Based Liability

PSG's first challenge to the Final Award is that the arbitration panel was without jurisdiction to determine the effect of the 2021 Stipulation on the IPA's arbitration clause. (*See* Cross Mot. Mem. at 6-7.)

As this Court has previously explained in denying PSG's request for a preliminary injunction, "there are two types of challenges to arbitration agreements: one which 'challenges specifically the validity of the agreement to arbitrate,' and one which 'challenges the contract as a whole.'" (2023 Op. at 4 (quoting *Buckeye*, 546 U.S. at 444).) Because the Court determined that PSG's challenge to the IPA based on the 2021 Stipulation was a challenge to the IPA "as a whole," the effect of the 2021 Stipulation was to be decided by an arbitrator, per the IPA's arbitration and delegation clauses. (*Id.*) In the intervening time, and after the parties briefed the instant petition and motions, the U.S. Supreme Court decided *Coinbase*, which PSG argues requires a different approach than the one this Court took in 2023. (*See* PSG *Coinbase* Letter at 5 ("Pursuant to *Coinbase*, the Court is required to adjudicate PSG's challenge to the arbitration by determining the meaning of the Stipulation and its effect on the IPA's arbitration and

9

delegation terms.").)  XL disagrees, arguing that *Coinbase* does not apply to this case because it did not "extend to situations involving two . . . contracts with only one . . . dispute resolution clause."  (XL *Coinbase* Letter at 5.)

In that case, Coinbase, Inc., a cryptocurrency platform, and its users executed two contracts: first, the User Agreement, which contained arbitration and delegation clauses; and second, the Official Rules of a cryptocurrency sweepstakes, containing a forum-selection clause that mandated that disputes be brought in California courts.  602 U.S. at 145.  When a dispute arose between users and Coinbase over whether the cryptocurrency sweepstakes violated California law, Coinbase sought to compel arbitration, arguing that—despite the conflict between the arbitration clause and the forum-selection clause—the User Agreement's delegation clause required questions of arbitrability to be decided by an arbitrator.  *Id.* at 147.  The Supreme Court disagreed, holding that "if parties have multiple agreements that conflict as to the third-order question of who decides arbitrability," then "traditional contract principles apply."  *Id.* at 149.  There, that meant that a court, rather than an arbitrator, needed to first decide whether the forum-selection clause in the Official Rules superseded the User Agreement, and with it, its delegation clause.  *Id.* at 150.  Critically, the user plaintiffs were not arguing that the Official Rules rendered the User Agreement null and void.  Instead, they argued that because they were challenging the delegation clause on the basis of supersession, an arbitrator could not decide arbitrability, as that aspect of the arbitrator's jurisdiction was the subject of the conflicting agreements.  *See id.* at 150-51.  On that score, the Supreme Court rejected Coinbase's invocation of *Buckeye*, explaining that while "a party seeking to avoid arbitration must directly challenge the arbitration or delegation clause," that rule "does not require that a party challenge *only* the arbitration or delegation provision," for "where a challenge applies 'equally' to the whole

contract and to an arbitration or delegation provision, a court must address that challenge." *Id.*
(quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010)).

In one sense, *Coinbase* is another example of the *Buckeye* and *Rent-A-Center* approach
that, in order to defeat arbitrability, a challenge to an arbitration or delegation provision must be
to the arbitration or delegation provision itself, rather than to the merits of an underlying contract
dispute. Because there were conflicting forum-selection provisions, that requirement was
satisfied. But in another sense, *Buckeye* and *Rent-A-Center* concern a special issue: the "matter
of substantive federal arbitration law," in which "an arbitration provision is severable from the
remainder of the contract." *Rent-A-Center*, 561 U.S. at 71 (quoting *Buckeye*, 546 U.S. at 445).
Those substantive law principles necessarily interact with state contract law to guide the
interpretation of arbitration and delegation provisions. *See id.* at 71-75 (considering the
operation of the severability principle in light of a state-law unconscionability challenge).
*Coinbase*, by contrast, explained *where* the application of substantive contract law is to occur:
the courts. *Coinbase*'s rule does not change that substantive law approach, nor did it purport to.[6]
*See Coinbase*, 602 U.S. at 150-51. Instead, *Coinbase* explains why the courts, and not
arbitrators, were deciding *Buckeye* and *Rent-A-Center* to begin with.

*Coinbase* is thus an application of a straightforward principle: In any arbitrability
dispute, there will be some question for the court to decide. Even in cases with delegation
clauses, courts will have to say whether or not the delegation clause is enforceable. *Buckeye* and

---

[6] For this reason, this Court's 2023 Opinion holding that *Buckeye* precluded litigating the question of arbitrability in this Court stands. However, for reasons explained further in this Opinion, even PSG's reading of the effect of the 2021 Stipulation on the IPA leaves intact a delegation clause which provides the arbitration panel, rather than this Court, with jurisdiction to decide what constitutes California-based liability (non-arbitrable) and what constitutes non-California-based liability (arbitrable).

*Rent-A-Center* tell courts how to treat broad challenges to agreements containing arbitration clauses—to "sever" those clauses from the agreements that contain them, if possible. "Severing" is merely one step of a threshold determination of the enforceability of an arbitration or delegation provision. And *Coinbase* says that determination is to be made by a court.

But precision is paramount. PSG is correct that there is an arbitrability question for the Court to decide, but it is not the arbitrability of California-based liability.[7] Instead, this Court must decide whether the arbitration panel had jurisdiction to determine arbitrability. In other words, this Court must decide *delegability*—the effect of the 2021 Stipulation on the IPA's delegation clause, rather than its arbitration clause. And if the 2021 Stipulation left the delegation clause in place, then what is and is not California-based liability was for the arbitration panel to decide, subject to vacatur only on the limited grounds provided for in the FAA.

PSG's interpretation of the 2021 Stipulation and IPA works this way: The 2021 Stipulation invalidated every term in the IPA "as they relate to [PSG's] California workers' compensation exposure." (2021 Stipulation ¶ 1.) And, importantly, those terms remain valid as they relate to "workers' compensation exposure outside the State of California." (*Id.* ¶ 4.) So, *at most*, the 2021 Stipulation created, in essence, new arbitration and delegation clauses that apply

---

[7] This also gives meaning to Clause 6 of the 2021 Stipulation, which provides that "[i]n the event that a proceeding is brought to enforce the terms of the Stipulation, the Stipulation shall be filed under seal, with all references to the Stipulation appropriately redacted, and otherwise treated as confidential within the context of those proceedings." (2021 Stipulation ¶ 6.) PSG argues that "[s]ealing the stipulation and redacting any discussion of the parties' agreement is only possible or necessary in [c]ourt, since the arbitration was already confidential, as recognized in paragraph 5 of the stipulation." (Cross Mot. Mem. at 25.) Setting aside the merits of the inference, that the Court has some role in this dispute (*i.e.*, verifying the enforceability of the delegation clause), demonstrates one context for which the parties may have wanted Clause 6's protections.

only to "workers' compensation exposure outside the State of California," and voided the prior ones. (*See id.*) But while that shrinks the orbit of the arbitration clause by reducing types of claims that may be brought in arbitration, it does not change the scope of the delegation clause, which leaves to the arbitration panel the determination of what is arbitrable (non-California-based liability) and what is not (California-based liability). Any other reading would eliminate the "new" delegation clause entirely, which would contradict the parties' explicit inclusion of a term in the 2021 Stipulation preserving delegation (not just arbitration) for non-California-based liability. Instead, the Court must give effect to the parties' explicit preservation of a delegation clause by virtue of Clause 4 of the 2021 Stipulation. *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 200 (2d Cir. 2018) ("[W]e must give effect and meaning to every term of a contract and strive to harmonize all of its terms." (cleaned up)). "[B]asic principles of contract and consent require that result." *Coinbase*, 602 U.S. at 151.[8] While PSG would have this Court reach another question—the effect of the 2021 Stipulation on the IPA's *arbitration* clause—that is beyond this Court's power.[9]

---

[8] PSG offers no alternative interpretation of the post-2021 Stipulation delegation clause in the IPA that the Court can identify. Instead, PSG appears to assume that there can be such a thing as a delegation clause that covers only particular types of claims and not others, leaving a court to decide whether the delegation clause applies to a particular claim. But that conception of a "delegation clause" delegates nothing and is thus not a delegation clause at all. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.") That is why this case is different from *Coinbase*: there, the users argued the delegation clause was *wholly* void. Here, the parties agree that a delegation clause survived the 2021 Stipulation. That conclusion is only strengthened by this Court's prior application of *Buckeye*—undisturbed by *Coinbase*—that the delegation clause must be severed and preserved where, as here, it is not itself the subject of a direct challenge.

[9] PSG argues also that the panel was without jurisdiction to award reimbursement for losses, about $10 million of the Final Award, under the "terms and conditions of the Policies." (Cross Mot. Mem. at 28-29 (emphasis omitted).) But that dispute goes to arbitrability, which, as

Though the panel acted within its power to decide whether amounts claimed by XL were California-based liability and thus non-arbitrable, it remains to determine whether the panel's decision on that question must nevertheless be vacated under Section 10(a)(4) for being utterly lacking in justification. "A party seeking relief under that provision bears a heavy burden." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013). "It is not enough for petitioners to show that the panel committed an error—or even a serious error." *Stolt-Nielson S.A. v. Animal Fees Int'l Corp.*, 559 U.S. 662, 671 (2010). "It is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable." *Id.* (cleaned up) (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam)).

With respect to the arbitrability of PSG's California-based liability, the panel concluded:

> [T]he only arbitrable right[] that XL agreed to forego was "to sever its claim in the Arbitration and not seek amounts which may be owed under the terms of the Insurance Program Agreement and Notices of Election related to [PSG's] California exposure." The only amounts "which may be owed" under the IPA [are] collateral, with all other amounts "owed" under the Policies, the Collateral Trust Agreement and the TPA agreement. This Final Award is confined only to the latter . . . .

---

already explained, the parties delegated to the arbitrators even after the 2021 Stipulation. It was thus for the panel to interpret the exclusion from arbitration disputes "regarding the terms and conditions of the Policies." (*See id.*) Though the panel's conclusion on that issue is difficult to parse, it appears that the panel agreed with XL that "no testimony nor evidence of" a "dispute regarding the 'terms and conditions' of the Policies" existed. (ECF No. 110-10 at 51.) In other words, the panel interpreted the phrase "dispute regarding the terms and conditions of the Policies" as a dispute over the *interpretation* of those Policies, rather than any ordinary breach-of-contract dispute brought under the Policies. (Indeed, XL represented to the panel that PSG "admitted" its liability under the Policies, eliminating any "dispute" (*see id.*).) Because the Court has already determined that the panel had jurisdiction over questions of arbitrability, the majority's interpretation of the phrase "dispute regarding terms and conditions of the Policies" is at least "barely colorable," and PSG offers no evidence of a disagreement between the parties over the meaning of the terms in the Policies, the Court concludes that Section 10(a)(4) does not provide a ground to vacate the award on this basis.

(Final Award at 6 n.1.)  The panel majority thus found the phrase "which may be owed" under the IPA to refer to collateral for California-based liability, with every other amount sought by XL in the arbitration "owed" under other agreements unaffected by the 2021 Stipulation.  (*Id.*)  On that reading of the 2021 Stipulation, the panel maintained jurisdiction for damages—including those for amounts paid to cover PSG's California-based liability—because they did not amount to deposited collateral.  PSG contests that interpretation, arguing that it would have been irrational for it to have agreed to such a stipulation when on the verge of achieving more (a total invalidation of the IPA with respect to *any* California-based liability, not just collateral) in the 2021 DOI Appeal.  (*See* Cross Mot. Mem. at 23-24.)  Moreover, PSG argues that XL should have been judicially estopped from taking that position, since it conceded much more before the Commissioner in the 2021 DOI Appeal.  (*See id.* at 24-25.)  The dissenting arbitrator adopted a similar position.  (*See* Final Award at 3.)

Both arguments fail to satisfy Section 10(a)(4)'s high standard.  In interpreting the phrase "may be owed," the panel majority made a determination of the meaning of the parties' agreement.  It did so based on a conclusion that the text of the 2021 Stipulation is unambiguous, notwithstanding the extrinsic evidence.  *Cf.  Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, Eng.*, 136 F.3d 82, 86 (2d Cir. 1998) ("If the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence.").  In basing its interpretation of the 2021 Stipulation on the text alone, the panel fulfilled its task "to interpret and enforce a contract, not to make public policy."  *Stolt-Nielsen*, 559 U.S. at 671.  And as for judicial estoppel (a doctrine that the arbitration panel need not necessarily adopt), the second element, "that the party seeking to assert [their] new position previously persuaded a court to accept its earlier position,"

*Intellivison v. Microsoft Corp.*, 484 Fed App'x 616, 619 (2d Cir. 2012) (summary order) (citing

*New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)), does not appear to have been met, since

the 2021 DOI Appeal was terminated not by the commissioner, but by PSG's own withdrawal.

(*See* Letter from CA DOI at 1 ("[T]he above-referenced appeal . . . was withdrawn by Personnel

Staffing on December 13, 2021.").)  Indeed, though PSG sought to reopen the 2021 Appeal on

the basis of XL's alleged breach of the 2021 Stipulation, the DOI refused:  "While a final

judgment or decision is subject to attack on the grounds of fraud, AHB[10] did not enter any final

judgment or decision in the proceeding.  Accordingly, the request to set side cannot be granted."

(*Id.* at 3.)  PSG's argument that the panel failed to apply the doctrine of judicial estoppel is thus

incorrect even upon *de novo* review.  Neither of PSG's arguments regarding the proper

interpretation of "amounts which may be owed under the terms of the Insurance Program

Agreement and Notices of Election related to [PSG's] California workers' compensation

exposure" suggests that the panel's decision was so baseless as to require vacating the award

under Section 10(a)(4).

### B.    Panel Prejudice[11]

PSG argues throughout its briefing that the Final Awards should be vacated because a

majority of the panel "engaged in classic prejudicial misconduct which rendered [the]

proceedings unfair."  (Cross Mot. Mem. at 22.)  PSG cites both Sections 10(a)(2) and 10(a)(3) in

its cross-motion to vacate the Final Award.

---

[10] "AHB" refers to the Administrative Hearing Bureau of the California Department of Insurance.  (*See* CA DOI Letter at 1.)

[11] PSG argues in a separate motion to vacate the Fee Award on the basis of 9 U.S.C. § 10(a)(2)-(3).  Because PSG included arguments about Gordon's dissent to that award in its cross-motion to vacate the Award, the Court considers all arguments about the panel's potential bias, corruption, or prejudicial misbehavior in this section.

An arbitration award may be vacated for "evident partiality or corruption" under Section 10(a)(2) "only where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Scandinavian Reinsurance Co. Ltd. v. St. Paul Fire and Marine Ins. Co.*, 668 F.3d 60, 72 (2d Cir. 2012) (quoting *Morelite Const. Corp. (Div. of Morelite Elec. Serv., Inc.) v. N.Y.C. Dist. Council Carpenters Ben. Funds*, 748 F.2d 79, 84 (2d Cir. 1984)). The party moving to vacate the award must show "something more than the mere 'appearance of bias,'" and the showing "must be direct and not speculative." *Morelite*, 748 F.2d at 83. Still, "[a] conclusion of partiality can be inferred 'from objective facts inconsistent with impartiality.'" *Scandinavian Reinsurance Co. Ltd.*, 668 F.3d at 72 (quoting *Pitta v. Hotel Ass'n of N.Y.C., Inc.*, 806 F.2d 419, 423 n.2 (2d Cir. 1986)). The typical case of partiality involves an allegation of a motive for an arbitrator to favor one party over the other. *See, e.g.*, *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 146-49 (determining that an undisclosed business relationship with a party constituted arbitrator partiality). "Among the circumstances under which the evident-partiality standard is likely to be met are those in which an arbitrator fails to disclose a relationship or interest that is strongly suggestive of bias in favor of one of the parties." *Scandinavian Reinsurance Co. Ltd.*, 668 F.3d at 72. Similarly, "[e]vidence of corruption must be abundantly clear in order to vacate an award under [Section] 10(a)(2)." *Kolel Beth*, 729 F.3d at 104. And "the unique role of arbitrators, whose special expertise arises from wide experience in their fields, sometimes leads to a gain of their professional knowledge and skill at the cost of the appearance of less than complete impartiality." *Pitta*, 806 F.2d at 423 (citing *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 173-74 (2d Cir. 1984)).

PSG's allegations of partiality and corruption fall short of the standard. To begin with, PSG does not allege any relationship between XL and members of the panel, or any other type of

personal motive that would drive the panel members to systematically favor XL. True, the standard does not require "proof of actual bias," *Morelite Const. Corp.*, 748 F.2d at 84, but it would far exceed the Court's narrow authority to vacate an arbitration award to infer partiality or corruption from the fact that an arbitration panel's decisions frequently favored one party. Several other "barely colorable justification[s]" exist for systematically favoring one party in an arbitration, such as a determination that their evidence, witnesses, and presentations are of superior credibility than those of the other party.

PSG points also to dissents written by Gordon accusing the majority of "unmerited favoritism toward XL" in the context of the Fee Award. (*See* Cross Mot. Reply at 12.) In particular, Gordon wrote that "[i]n [his] view, the Majority [had] demonstrated an inclination to favor XL over PSG from the outset, such that [he] . . . had profound concerns regarding the fairness of [the] proceeding and conclude[d] that the Majority's final award and attorneys' fees awarded may have been preordained from the outset." (ECF No. 113-2 ("Gordon Fee Award Dissent") at 3.) Gordon provided five bases for that accusation:

> 1) XL has prevailed in these proceedings on the strength of argument and supposition, and not on the evidence presented; 2) XL has been permitted to raise and pursue legal claims that had no merit from the outset and, subsequently, has been allowed to modify existing claims and assert new claims when its original claims were disproven; 3) the Majority has ignored its own Interim Order which had precluded an award of collateral for California claim exposure only to award XL millions of dollars for future adverse development of California claim exposure (tantamount to an award of collateral); 4) the Majority has repeatedly misinterpreted or ignored evidence proffered in these proceedings by PSG that would have supported PSG's defenses; and 5) now the Majority is allowing XL to recover fees incurred by XL secondary to its pursuit of meritless legal theories.

(*Id.*) Gordon's dissent to the Fee Award, though nominally relevant to the issue of fees, costs, and interest, details what Gordon determined was a pattern of unfair and prejudicial conduct by the panel over the course of the entire arbitration, beginning with the majority's narrow interpretation of the 2021 Stipulation. (*See id.* at 3-14.) But while Gordon argues forcefully in

dissent that the majority made incorrect decisions on issues of arbitrability, the consideration of

evidence, and the allowance of attorney's fees, he notably does not accuse the majority of any

improper motivation driving its decision-making.  In fact, Gordon concludes his dissent with the

opposite, explaining:

> I have known Donald Decarlo for 40 years and hold him in the highest regard as a
> consummate professional.  I have no doubt that Jonathan Rosen is equally qualified
> based on his vast experience on behalf of the insurance industry.  Notwithstanding,
> it has been difficult for me to have participated in these proceedings as I do not
> believe that the rulings have been impartial.

(*Id.* at 14.)  At bottom, Gordon never once accused the panel majority of being corrupt or

possessing any relationship or motive that would render it partial.  The quote above,

notwithstanding the conclusory accusation of partiality, suggests the opposite.  Under PSG's

approach, if an arbitration panel makes enough decisions against one party that that party thinks

are incorrect, that party may tie those decisions together and present them as evidence of

systematic partiality under Section 10(a)(2).  But that would convert the narrow authority of a

district court to review arbitral awards under Section 10(a) into a broad, supervisory power to

test the propriety of arbitrators' discrete legal rulings *de novo* and, after determining that they are

incorrect, deciding whether to infer partiality from that determination.  PSG cites no authority for

such a broad power, and the Court is aware of none.  As the Second Circuit has clarified, what is

required is "a showing of something more than the mere appearance of bias to vacate an

arbitration award, and [courts] will not vacate arbitration awards for evident partiality when the

party opposing the award identifies no direct connection between the arbitrator and the outcome

of the arbitration."  *Certain Underwriting Members of Lloyds of London v. Fla., Dep't of Fin.*

*Servs.*, 892 F.3d 501, 507 (2d Cir. 2018) (cleaned up).  Instead of alleging a source of bias and

showing its "direct connection" to the outcome, PSG works backwards, inferring from the

outcome that there must have been some partiality on the part of the arbitrators.  (*See, e.g.*, Vac.

Fee Award Reply at 6.)  That is insufficient to warrant vacating the awards, since it does not

show a "direct connection" between a source of partiality or corruption and the outcome of the

arbitration.

PSG argues also that the awards should be vacated under Section 10(a)(3), which

provides for vacatur "where the arbitrators were guilty of misconduct in refusing to postpone the

hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to

the controversy; or of any other misbehavior by which the rights of any party have been

prejudiced."  9 U.S.C. § 10(a)(3).  "Courts have interpreted section 10(a)(3) to mean that except

where fundamental fairness is violated, arbitration determinations will not be opened up for

evidentiary review."  *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997).  "In

handling evidence an arbitrator need not follow all the niceties observed by the federal courts.

He need only grant the parties a fundamentally fair hearing."  *Bell Aerospace Co. Div. of

Textron, Inc. v. Local 516, Int'l Union, United Auto., Aerospace & Agr. Implement Workers of

Am. (UAW)*, 500 F.2d 921, 923 (2d Cir. 1974).  And in reviewing for fundamental fairness,

"[f]ederal courts do not superintend arbitration proceedings."  *Tempo Shain*, 120 F.3d at 20

(quoting *Teamsters, Local Union 657 v. Stanley Structures, Inc.*, 735 F.2d 903, 906 (5th Cir.

1984)).  Where challenged conduct "[does] not violate basic notions of morality and justice or

due process," it "[does] not violate fundamental fairness."  *Agility Pub. Warehousing Co. K.S.C.,

Pro. Contract Admins., Inc. v. Supreme Foodservice GmbH*, 495 Fed. App'x 149, 153 (2d Cir.

2012) (summary order) (rejecting a Section 10(a)(3) challenge where an arbitration panel drew

negative inferences from corporate executives' refusal to testify).

It is not entirely clear what conduct of the panel majority PSG deems to fall within

Section 10(a)(3), as opposed to Section 10(a)(2).  (*See, e.g.*, Vac. Fee Award Reply at 6-8 (citing

both subsections but applying only the standard of partiality).)  For example, PSG argues that, in

the course of prosecuting its ultimately unsuccessful fraud claim, XL relied on "soliloquy" rather

than evidence, but the panel refused to grant summary judgment for PSG.  (Vac. Fee Award at

12.)  An arbitration panel's refusal to grant summary judgment based on its apparent belief that a

factual controversy existed is not, contrary to PSG's protest, a "deni[al] [of] due process and the

basic fairness required by law."  (*Cf. id.*)  PSG maintains also that the panel's decisions on

various merits issues—including the effect of the 2021 Stipulation, its definition of the difference

between "collateral" and "accelerated damages," and whether PSG was entitled to an offset of

damages—manifested fundamental unfairness.  (*See* Cross Mot. Mem. at 22.)  But Section

10(a)(3) is not a vehicle for review of the merits of an arbitration panel's decision.  PSG does not

argue, as is required under Section 10(a)(3), that the panel overlooked any evidence or failed to

afford PSG an opportunity to present certain arguments.

The same goes for the panel's award of XL's attorney's fees, including those PSG argues

were spent prosecuting an unsuccessful and changing fraud claim.  (*See* Mot. Vac. Fee Award at

13-14.)  XL responds that it provided a calculation of its fees—only a small portion of which

were spent prosecuting the fraud claim—to the panel, which subsequently conducted "a

meticulous review of the record, including the Kadian Affirmation and corresponding exhibits."

(Opp. Vac. Fee Award at 12 & n.1.)  XL points out also that the panel reduced its requested

costs, refuting the allegation of bias and underscoring the majority's careful review of the

arguments and evidence.  (*Id.* at 12-13.)  That does not rise to the level of fundamental

unfairness, especially in light of federal court cases permitting prevailing plaintiffs to recover

fees spent prosecuting unsuccessful claims related to their successful ones.  *See, e.g.*, *Flanagan

v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 663 F. Supp. 2d 662, 668, 674 (N.D. Ill.

2009) (granting attorney's fees to a plaintiff under 41 U.S.C. § 1988 who prevailed on a sex-discrimination claim but not a retaliation claim); *Spanish Action Comm. of Chi. v. City of Chicago*, 811 F.2d 1129, 1133 ("A plaintiff may not recover attorney's fees for time expended on an unsuccessful claim if that claim is 'distinct in all respects from his successful claims.'" (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983))). Again, PSG seeks to convert Section 10(a)(3)—a procedural provision—into a vehicle for challenging the substance of the arbitration award. But that is not the law. The panel majority's decision to award XL all of its requested fees and a part of its requested costs was not fundamentally unfair, as it was supported at least by a "barely colorable justification" for the award.[12]

The Court concludes that there is no basis for vacating the Final Award or the Fee Award under Sections 10(a)(2) or 10(a)(3) of the FAA.

### C.    Accelerated Damages

PSG argues also that the arbitration panel improperly "awarded[] approximately $27 million under the IPA's acceleration provision," despite that fact that "[a]bout $21 million [of that amount] was for future estimated California-based exposure." (Cross Mot. Mem. at 26 (emphasis omitted).) According to PSG, "both XL and the panel acknowledged that the right to an accelerated payment appears only in the IPA." (*Id.*) PSG is correct that the panel cited only the IPA as a contractual basis for acceleration, and noted also that it "is [also] a customary remedy under insurance policies akin to the ones at bar in the event of default regardless of the provisions or existence of the IPA." (*Id.* at 27 (quoting Final Award at 6 n.1).) And PSG is also correct that the IPA's arbitration provision prohibits the award of "punitive, exemplary, extra-

---

[12] PSG's only argument against the Fee Award is that it should be vacated under Sections 10(a)(2) and 10(a)(3). Because, for the reasons stated above, neither Section provides grounds for vacatur, PSG's motion to vacate the Fee Award is denied.

contractual, consequential, or similar damages, however denominated, arising out of or in connection with a breach of this Agreement." (*Id.* (quoting IPA at 13-14) (emphasis omitted).) Accordingly, PSG contends that "either the $21 million portion of the award is based on the IPA in violation of the parties' stipulation, or it is not based on any contract term in violation of the express limitation on the panel's power to fashion awards." (*Id.*) Though PSG does not cite any section of the FAA explicitly, the analysis appears to be directed at Section 10(a)(4).

But as already explained, Section 10(a)(4) carries an exceptionally high burden for vacating an award, requiring district courts to affirm awards even where the arbitrators committed "serious error." *Stolt-Nielson*, 559 U.S. at 671. On that score, PSG's argument fails at two junctures. First, while the IPA prohibited "extra-contractual" remedies for a "breach of *this* Agreement" (IPA at 13-14 (emphasis added)), the panel awarded accelerated damages for "multiple breaches of the Policies, Collateral Trust Agreement and the TPA Agreement, entitling not only damages in the amounts presently due, but an acceleration of obligations under the Policies and Collateral Trust Agreement." (Final Award at 10.) Thus, the provision of extra-contractual remedies for breaches of the other agreements was not outside the arbitrators' power and cannot be the basis for Section 10(a)(4) vacatur. Second, even if the Court were to treat all of PSG's liability as flowing from the IPA, recall that the panel's interpretation of the IPA permitted XL to seek in arbitration damages for PSG's California-based liability, just not collateral for the same. An "at least colorable justification" for the panel's award of accelerated damages is that they are distinct from collateral—as damages actually "owed" rather than those that "may be owed"—and thus fell within the panel's jurisdiction.[13] That PSG calls the $27

---

[13] The same goes for claim-administration fees paid to Gallagher Bassett, which PSG argues should be excluded from the award to the extent that they were paid to administer California claims. (Cross Mot. Mem. at 28.) But because no one—including PSG—argues that

million "collateral" because it functions similarly, *i.e.*, as "security for future estimated California-based liabilities" (Cross Mot. Mem. at 28), does not mean that the panel's contrary conclusion is so egregiously wrong as to be vacated under Section 10(a)(4). Deposited collateral and accelerated damages, however similar in function or amount,[14] are technically distinct.

### D.     Offset

Finally, PSG argues that the panel erred in not awarding PSG a credit against XL's damages of $7.2 million, plus $568,111 in interest, as a result of XL's drawing down on a letter of credit, as even XL's witness testified. (Cross Mot. Mem. at 29.) PSG argues also that it was entitled to an additional offset of $861,850 for interest XL earned on PSG's collateral. (*Id.*) PSG frames this omission as the panel's ignorance of "material evidence and undisputed facts when calculating its award" in violation of Section 10(a)(3). But, again, Section 10(a)(3) provides a vehicle for *procedural* challenges to arbitration, and PSG does not argue that the panel denied it an opportunity to present arguments relating to offsets from the letter of credit or earned interest. Instead, PSG seeks to use the panel's omission of a clear position in its Final Award on the question of offsets as a "refus[al] to hear evidence pertinent and material to the controversy." *Cf.* 9 U.S.C. § 10(a)(3). To the contrary, there is direct evidence that the panel did hear the evidence, as the Final Award concludes that "PSG presented no credible evidence that it

---

those claim-administration fees constituted "collateral" (in fact, PSG refers to them as "damages" in their reply (Cross Mot. Reply. at 8 n.5)), the Court has no basis to disturb the panel's conclusion that it had jurisdiction to include them in the Final Award.

[14] PSG argues that "XL's own actuary testified that there is no difference between the calculations he performed to determine 'collateral' due under the IPA, and the calculation he performed to support XL's $27 million demand for future liabilities." (Cross Mot. Mem. at 28.) But just because two remedies—one which is outside of an arbitrator's power and another which is within it—come to the same total by virtue of the same calculation does not mean that the arbitrator is without power to award either of them. And even if it were a "serious error" to come to such a conclusion, even that type of error would be insufficient to vacate under Section 10(a)(4). *Cf. Stolt-Nielsen*, 559 U.S. at 671.

was entitled to a setoff due to XL's draws on the letters of credit (an argument that was raised for the first time at the Hearing)." (Final Award at 11.) Far from prejudicial misbehavior, the panel considered the evidence and made a credibility determination which this Court cannot disturb merely because PSG disagrees with it. And as to earned interest, the panel most likely did not consider the issue because of its earlier holding that it had "no jurisdiction over collateral related to PSG's workers compensation exposure as provided for under the terms of the IPA." (*Id.* at 10.) As the panel determined that it lacked jurisdiction over collateral, it was sensible for the majority not to offset the award based on interest earned by XL on the collateral it did receive from PSG. Indeed, the panel may well have determined that doing anything else would be in excess of its jurisdiction. In any event, those substantive determinations do not amount to a failure of the panel to conduct a fair hearing and were supported by colorable justification.

In sum, PSG's challenges to the awards under Section 10(a) of the FAA are without merit. XL's petition to confirm the Final Award is granted. XL's petition to confirm the Fee Award, included in its opposition to PSG's motion to vacate the same, is also granted.

### E. Preliminary Injunction Motion

PSG's motion for a preliminary injunction in Case Number 24-CV-4550 depended on the risk that the California Department of Insurance would issue a ruling with *res judicata* effect that precluded this Court from considering the petitions to confirm the 2023 Final Award and Fee Award. Because this Court has now ruled on those petitions in advance of the California Department of Insurance's ruling, the motion for a preliminary injunction is denied as moot.

## IV. Conclusion

For the foregoing reasons, XL's petition to confirm the Final Award dated August 2, 2023, is GRANTED and PSG's cross-motion to vacate the Final Award is DENIED.

XL's petition to confirm the Fee Award dated October 17, 2023, is GRANTED and PSG's motion to vacate the Final Award is DENIED.

The Final Award dated August 2, 2023, and the Fee Award dated October 17, 2023, are hereby CONFIRMED.

PSG's motion for a preliminary injunction in Case No. 24-CV-4550 is DENIED AS MOOT.

The Clerk of Court is directed to:

1. terminate the following motions in Case No. 22-CV-10259: ECF Nos. 104, 109, 120, 121, and 122;

2. terminate the following motion in Case No. 24-CV-4550: ECF No. 12;

3. enter final judgment confirming the arbitration awards in Case No. 22-CV-10259 and close that case.

    SO ORDERED.

Dated:  November 4, 2024
        New York, New York

_____
              J. PAUL OETKEN
          United States District Judge